**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | Docket no. 2:18-cr-00063-GZS |
| JOHN VALDES, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**ORDER ON MOTION TO SUPPRESS**

Before the Court is Defendant John Valdes' Motion to Suppress (ECF No. 59). The Court held an evidentiary hearing on this Motion on December 4, 2018, and, thereafter, received supplemental briefing from the parties (ECF Nos. 288 & 291). Having considered the evidence presented at the hearing, as well as the arguments submitted by counsel, the Court DENIES the Motion for the reasons outlined below.

## I.    FACTUAL FINDINGS

In 2017, the United States Drug Enforcement Administration ("DEA"), along with other law enforcement agencies, began investigating a suspected marijuana trafficking operation in Androscoggin County, Maine. As part of this investigation, officers conducted extensive surveillance on a residence at 1302 Sabattus Street in Lewiston ("the residence"), which was home to Richard Daniels. Based on information gleaned from an informant, they believed the residence was being used to distribute large amounts of marijuana to local and out-of-state buyers.

While conducting surveillance on August 24, 2017, DEA Taskforce Agent Barry Kelly ("Kelly") saw a black Chevy Suburban with Massachusetts registration park at the residence. The vehicle remained at the residence for forty minutes and, upon departure, drove straight to I-95

South.  Suspicious that the Suburban was trafficking marijuana out of the state, Kelly pursued it from the residence and into New Hampshire.  There, Kelly coordinated with the New Hampshire State Police to set up a traffic stop.  New Hampshire State Trooper Brian Gacek ("Gacek") identified the Suburban on I-95 and pulled it over for speeding.  He then approached the front of the vehicle, observing a duffel bag in the rear storage area as he went, and spoke to the driver.  The driver provided a Massachusetts license identifying him as John Valdes.  During the ensuing conversation, Gacek detected the odor of fresh marijuana emanating from the open window.[1]  Gacek proceeded to ask Valdes about the odor and Valdes fumbled with his story.  Valdes initially responded that he did not smoke marijuana, but then revised that answer twice.  He first backtracked by saying that he had smoked marijuana in the vehicle the previous day, and then amended that account by saying that he had actually done so on the morning of the 24th.  When Gacek indicated that he smelled fresh not burnt marijuana, Valdes suggested that the odor was coming from his skin.

Trooper Gacek then asked Valdes to step out of the vehicle and conducted a pat down revealing a large bundle of cash in one of his pockets.  Next, Gacek asked Valdes if there was any marijuana in the Suburban.  Valdes initially said no.  Gacek then requested permission to search the vehicle, which Valdes refused.  In response, Gacek informed Valdes that if he did not provide consent, Gacek had the authority to seize the Suburban while he applied to a judge for a search warrant.  After hearing this, Valdes informed Gacek that there was marijuana in the vehicle.  Gacek queried how much and Valdes disclosed that it was four or five pounds.  Gacek then asked Valdes if he wanted to consent to a search or go through the search warrant application process.  Valdes responded by granting his consent.  After that, Gacek read a consent form to Valdes and, roughly

---

[1] Gacek has repeatedly experienced the odor of fresh marijuana since he became a State Trooper in 2005.  The Court thus credits his testimony that he detected that odor coming from inside the Suburban.

twenty-nine minutes after the initial stop, Valdes signed it. At no time during or prior to this exchange did Gacek raise his voice, unholster his weapon, threaten Valdes, or restrain him. The subsequent search revealed a duffel bag containing marijuana in the passenger compartment's rear storage area.[2] The marijuana was mostly vacuum sealed, but Gacek found some in "one or two" Ziploc bags. (12/04/18 Tr. (ECF No. 280), PageID # 611.) Gacek then placed Defendant in handcuffs and transported him to the Greenland Police Department for an interview.[3]

Approximately one month later, on September 29, 2017, Agent Kelly observed Richard Daniels placing a black bag in the trunk of a white Dodge Charger parked at the residence. The car had Texas registration and was later discovered to be a rental vehicle. After the Charger departed, Kelly followed as it drove directly onto I-95 South. Once the car crossed into New Hampshire, Kelly again coordinated a traffic stop, this time with Sergeant Mark Hall ("Hall") of the New Hampshire State Police. Hall located the Charger on I-95, pursued it, and eventually pulled it over for multiple traffic violations.[4] Hall approached the driver's side door and noted that there were two men inside. He asked the driver for his license and registration, identified the driver as Valdes, and identified the passenger as Michael Miller. During this interaction, Hall noticed that Valdes was abnormally nervous for a traffic stop, and that Miller would not meet his gaze. Hall then smelled the odor of fresh marijuana coming through the window.[5] Upon detecting this

_____

[2] Gacek was the only officer present at the scene prior to Valdes' consent. Another officer may have arrived to help Gacek conduct the search, but Gacek does not recall if one did.

[3] Although Defendant's Motion contains argument related to a request for counsel that he allegedly made at some point on August 24, 2017, the record developed at the hearing contains no evidence of such a request.

[4] Defendant's counsel conceded at the start of the evidentiary hearing—as well as at a conference of counsel on September 24, 2018—that the traffic stops on August 24th and September 29th were valid.

[5] Hall, like Gacek, has extensive experience with the distinctive odor of fresh marijuana. The Court credits his testimony that he smelled this odor emanating from inside the Charger.

odor, Hall requested that Valdes step out of the car. Valdes did as he was asked, and Miller stayed in the Charger.

Once Valdes was outside, Hall asked him several questions. First, Hall asked Valdes where they were coming from. Valdes said that they were coming from Belgrade—a statement that Miller contradicted shortly after when he said they were coming from "Sabattus." (12/04/18 Tr., PageID # 629.) Hall also asked Valdes if there was any marijuana in the car. Valdes initially said no but stated that he had smoked some in the car earlier that day. Hall then asked if there was even a small amount of marijuana inside, and Valdes admitted that there was. On being asked to quantify the amount, Valdes said it was about a pound. At that point, Hall requested permission to search the vehicle. Valdes hesitated, asked if he was going to be arrested, and Hall replied that he could not make any promises. Hall then allowed Valdes to consider his request briefly before repeating it. This time, Valdes granted consent verbally. Soon afterward, Trooper Gacek arrived on the scene and Hall retrieved a consent form, which he read to Valdes and allowed Valdes to read. Twenty-six minutes from the initial stop, Valdes signed the form. The officers then searched the car. In the trunk, they found a pizza box full of honey butane oil, which is a form of marijuana concentrate, and a duffel bag containing twelve gallon-sized Ziploc bags of marijuana.

## II.    DISCUSSION

Defendant argues that the Court should suppress all evidence derived from the August 24th and September 29th roadside interactions and searches.[6]   He contends that: (1) the searches violated his rights because neither fell within a recognized exception to the Fourth Amendment's

---

[6]  The Court limits its discussion to these two events because the government stated on the record that it would not attempt to introduce any evidence obtained on either August 24th or September 29th "after the drugs were seized." (12/04/18 Tr., PageID # 573-574.) Likewise, the government indicated at the hearing that it only plans to use evidence obtained during the May 2, 2018, search of the Defendant's residence—including statements obtained during the search—if Defendant testifies at trial. The Court thus denies the Motion to Suppress as it relates to evidence obtained from the May 2nd search but does so without prejudice to Defendant renewing the corresponding portion of his argument if he decides to testify at trial.

warrant requirement; and (2) the officers illegally obtained his statements on both occasions through un-*Mirandized* custodial interrogation.  However, the Court disagrees on both fronts.

## A.  The Warrant Requirement

The Fourth Amendment's prohibition against unreasonable searches and seizures generally forbids the government from conducting warrantless searches unless one of "a few specifically established and well-delineated exceptions" applies.  Arizona v. Gant, 556 U.S. 332, 338 (2009) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)) (internal quotation marks omitted).  Any evidence obtained from a warrantless search that does not fall into such an exception is subject to exclusion.  See United States v. Tiru-Plaza, 766 F.3d 111, 115 (1st Cir. 2014).  Relevant to this case are the automobile exception and the consent exception.  See United States v. Franklin, 630 F.3d 53, 59-61 (1st Cir. 2011) (discussing both).  The former allows the police to "seize and search an automobile prior to obtaining a warrant where they have probable cause to believe that the automobile contains contraband."  United States v. Silva, 742 F.3d 1, 7 (1st Cir. 2014).  The latter allows the police to conduct a warrantless search based on consent that is given "freely and voluntarily."  United States v. Jones, 523 F.3d 31, 37 (1st Cir. 2008).  Where, as here, a defendant moves to suppress evidence seized without a warrant, the government bears the burden of proving that an exception applies.  United States v. Ramos-Morales, 981 F.2d 625, 628 (1st Cir. 1992).

### i.  Automobile Exception

The Court first concludes that both searches were valid under the automobile exception. The government has carried its burden to show that probable cause provided prior justification for each search.  See Silva, 742 F.3d at 7.

"Probable cause exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime."  United States v. Burhoe, 409 F.3d 5, 10 (1st

Cir. 2005) (quoting <u>United States v. Young</u>, 105 F.3d 1, 6 (1st Cir. 1997)) (internal quotation marks omitted). "[T]he existence of probable cause is to be evaluated on the basis of the collective information of the law enforcement officers engaged in a particular investigation." <u>United States v. Diallo</u>, 29 F.3d 23, 25-26 (1st Cir. 1994) (alteration in original) (quoting <u>United States v. Curry</u>, 751 F.2d 442, 446 (1st Cir. 1984)) (internal quotation marks omitted). The First Circuit has made clear that "when a law enforcement officer detects the odor of marijuana emanating from a confined area, such as the passenger compartment of a motor vehicle, that olfactory evidence furnishes the officer with probable cause to conduct a search of the confined area." <u>United States v. Staula</u>, 80 F.3d 596, 602 (1st Cir. 1996). Other information that the First Circuit has found relevant to the probable cause calculus includes: an admission from a suspect that a place in question contains illegal drugs, large sums of cash found on a suspect's person, a suspect's nervousness and contradictory statements, and inconsistent statements made by different suspects. <u>See</u> <u>United States v. Dion</u>, 859 F.3d 114, 133 (1st Cir. 2017) (citing with approval the proposition that inconsistent stories told by different suspects support an inference of criminal activity); <u>United States v. Henry</u>, 827 F.3d 16, 30 (1st Cir. 2016) (including in the probable cause calculus the fact that officers found "a large sum of cash in [the defendant's] jacket pocket, which is 'indicative of sex and drug trafficking'"); <u>Franklin</u>, 630 F.3d at 61 (finding that officers had probable cause to search a car where defendant "told them there was marijuana in the car"); <u>United States v. Brown</u>, 457 F.2d 731, 733 (1st Cir. 1972) (finding defendant's nervousness and "contradictory statements" relevant in concluding that officers had probable cause to arrest).

As to the events of August 24th, Gacek had more than enough information to search the Suburban's passenger compartment and contiguous rear storage area when he did. The combination of the odor, Defendant's inconsistent story as to its source, the wad of cash found in his pocket, and his admission that there was four or five pounds of marijuana in the vehicle, would

have led any "reasonably prudent person" to believe that there was an illegal quantity of marijuana therein. Burhoe, 409 F.3d at 10. The officers' search on September 29th was similarly justified. On that occasion, the odor, Defendant's abnormal nervousness, his admission that there was a pound of marijuana in the car, and the inconsistent statements made by the two occupants—all on top of Agent Kelly's observation of a black bag being placed in the trunk—supported a reasonable belief that an illegal amount of marijuana would be found where it was. See id. Thus, the automobile exception legitimized both searches.

ii.     **Consent Exception**

The Court alternatively concludes that Defendant provided valid consent for both searches. As a result, neither search was "proscribed under the Fourth Amendment." United States v. Lee, 317 F.3d 26, 33 (1st Cir. 2003).

When a defendant's consent to search is at issue, the government must prove by a preponderance of the evidence that consent was voluntary "and not the result of duress or coercion, express or implied." United States v. Hinkley, No. 2:13-cr-00049-NT, 2014 WL 119293, at *10 (D. Me. 2014) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 248 (1973)) (internal quotation marks omitted). The Court determines whether the government has met its burden by examining the "totality of circumstances surrounding the interaction between the defendant and the authorities." United States v. Perez-Montanez, 202 F.3d 434, 438 (1st Cir. 2000). The First Circuit has held that "consent to a search is invalid if given only because of an officer's knowingly false assurance that there will soon be a lawful search anyway." United States v. Vazquez, 724 F.3d 15, 22 (1st Cir. 2013). However, it has also observed that where an officer assures a suspect of an inevitable search, and that assurance is supported by probable cause, the suspect's ensuing consent is not necessarily invalid. See United States v. Hinkley, 803 F.3d 85, 91 (1st Cir. 2015). In other words, "it is not police coercion to inform an individual what the likely consequences will be if

the individual refuses consent, thereby providing context for the individual's decision, but [] it is police coercion to obtain consent only by tricking an individual into falsely believing a search is inevitable." Hinkley, 2014 WL 119293, at *10.

Viewed in their totality, the facts here demonstrate that the officers' actions were "proper; in fact, scrupulous" and that Defendant's consent to both searches was voluntary. United States v. Twomey, 884 F.2d 46, 51 (1st Cir. 1989). Despite Defendant's assertions to the contrary, the officers involved in the searches neither threatened or restrained Defendant prior to gaining his consent, nor told him that a search of his car was inevitable. Officer Gacek's summary of the warrant application process on August 24th can only be classified as a precise description of the legal procedures that would follow if Valdes refused consent, "thereby providing context for" his decision. Hinkley, 2014 WL 119293, at *10. Even if the officers had informed Defendant that refusing consent would be futile during either stop, such a statement alone would not have invalidated Defendant's consent given that the officers had probable cause to search both times. See Hinkley, 803 F.3d at 91. Not only did the officers avoid coercion, but they also made sure to inform Valdes on both occasions that he had the right to refuse consent.[7] Given those facts, and that Valdes signed both consent forms, the government has shown by a preponderance of the evidence that Valdes consented to the searches voluntarily.[8]

## B. Custodial Interrogation

The Court lastly holds that none of Valdes' roadside statements—including his admissions that the vehicles contained illegal amounts of marijuana—should be suppressed based on the

---

[7] On the 24th, Gacek told Valdes of his right to refuse consent prior to retrieving the consent form, and then again by reading him the form. On the 29th, the officers did so by reading him the form and letting him read it himself.

[8] The Court also notes that there is no evidence regarding Defendant's age, education, or experience that would suggest an inability to consent in this case. See United States v. Marshall, 348 F.3d 281, 286 (1st Cir 2003) (noting that "[f]actors to be considered [in the consent analysis] include age, education, experience, knowledge of the right to withhold consent, and evidence of coercive tactics").

officers' failure to *Mirandize* him. He was not in custody at the time of these statements and the officers were therefore under no duty to provide *Miranda* warnings.

As the First Circuit has noted, the *Miranda* rule "applies only to custodial interrogations." United States v. Melendez, 228 F.3d 19, 21 (1st Cir. 2000). Routine traffic stops, despite that they involve a restriction on the driver's freedom of movement, are not custodial. See Berkemer v. McCarty, 468 U.S. 420, 439-440 (1984). Instead, they are akin to investigative *Terry* stops, which only become custodial where there has been "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." United States v. Trueber, 238 F.3d 79, 93 (1st Cir. 2001) (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)) (internal quotation marks omitted). Assessing whether a stop rises to this level requires an objective analysis of "all the circumstances surrounding the interrogation." United States v. Ventura, 85 F.3d 708, 711 (1st Cir. 1996). "Relevant circumstances include 'whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation.'" Id. (quoting United States v. Masse, 816 F.2d 805, 809 (1st Cir. 1987)).

Neither stop had become sufficiently restrictive at the time of Defendant's statements to trigger *Miranda*. The August 24th stop took place in a neutral setting, there was only one officer present at the scene prior to Valdes' consent, the officer's questioning was brief and related to his suspicions of illegal activity, and the officer did not restrain or even threaten to restrain Valdes until after the search, which took place following the statements now at issue. See United States v. Teemer, 394 F.3d 59, 66 (1st Cir. 2005) (noting that a traffic stop of "slightly over 30 minutes" falls within the range of a valid *Terry* stop); Trueber, 238 F.3d at 94 (concluding that presence of five officers did not make stop custodial where only two were in "direct proximity" to the defendant and "only one questioned him"); United States v. Jones, 187 F.3d 210, 218 (1st Cir.

1999) (finding no physical restraint where the suspect was asked to step out of the vehicle and indicating that "a public highway is a neutral setting"); Masse, 816 F.2d at 809 (declining to suppress pre-arrest statements in part because "agents' questioning of [the defendant] was brief; its purpose was to dispel or to confirm their suspicions of wrongdoing").  The September 29th stop also took place in a neutral setting, lasted for a similar amount of time, involved only two officers who limited their questioning to valid suspicions of wrongdoing, and who never restrained Valdes.  Under these circumstances, Defendant made his statements when the stops fell into "the *Terry* stop range and short of any *de facto* arrest or custodial interrogation."  Teemer, 394 F.3d at 66.  Thus, the statements are not subject to suppression under *Miranda*.[9]  Id.

## III.  CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress (ECF No. 59) is DENIED.


SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 3rd day of January, 2019.

---

[9]  The fact that Defendant's admissions are not subject to suppression defeats Defendant's state law argument.  That argument is essentially that: because it is legal to have up to "[t]wo ounces of usable cannabis" in New Hampshire, "smell alone" cannot supply probable cause to believe that a car contains an illegal amount of marijuana.  N.H. Rev. Stat. Ann. § 126-X:2.  (Def.'s Supp. Br. (ECF No. 288), PageID # 667.)  However, the officers did not rely on smell alone to justify either search.  On both occasions, Defendant admitted that the car in question contained more than the legal limit of marijuana (four or five pounds on the 24th and a pound on the 29th), furnishing the officers with probable cause to believe that he was breaking the law.